UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-23536-CIV-COOKE/GOODMAN

AMY HINDSMAN,

    Plaintiff,

v.

CARNIVAL CORPORATION, et al.,

    Defendants.
_____/

## ORDER ON DISCOVERY OF PLAINTIFF'S GROUP THERAPY JOURNAL ENTRIES

Amy Hindsman was a passenger aboard Defendant Carnival Corporation's *Valor* for a four-day, round-trip cruise from Galveston, Texas to the western Caribbean. According to her Amended Complaint, Hindsman was either drunk, drugged, or a combination of the two during a dance-filled evening on the ship. She says she was incapacitated to the point of being incapable of consenting to sex. She also alleges that a Carnival crewmember, a performer in the ship's casino, raped her on the evening of September 13, 2018. She alleges that he had sexual intercourse with her aboard the *Valor* when she was too incapacitated to consent. Hindsman woke her roommate two nights later (on the night of September 15, 2018) and told her about the rape. She also advised other friends about it the next morning (i.e., September 16, 2018).

The *Valor* returned to port on the morning of September 17, 2018. Hindsman disembarked and advised her husband, in a text message, about the sexual assault. She also advised Carnival of the rape. The record submitted to the Undersigned does not reflect that the crewmember was prosecuted, arrested, or even questioned by law enforcement officials. During a recent hearing, Carnival's counsel advised that the entertainer, the alleged rapist, *wanted* to give a deposition "in order to clear his name." In a more-recent hearing, the parties advised me that the John Doe crewmember, whose name is Yeison Lizcano, has now given deposition testimony. Counsel also confirmed the absence of criminal prosecution, arrests, or police investigation.

After the cruise, Hindsman suffered many panic attacks. Her anxiety became so severe that paramedics were called to her place of employment on September 18, 2018. Hindsman's Amended Complaint provides that she has been diagnosed with Post Traumatic Stress Disorder as a consequence of the rape. According to an affidavit she publicly filed in this case [ECF No. 97-1], Hindsman attempted suicide as a result of the rape and was hospitalized. A therapist facilitating Hindsman's hospital-based group therapy sessions directed her to make journal entries.

Carnival wants Hindsman to produce all of her journal entries. Hindsman objects, contending that they are protected by the psychotherapist-patient privilege. She also says they are not relevant and that producing them would be unfairly prejudicial, constitute an undue invasion of her privacy, and would cause substantial embarrassment. But

Carnival contends that Hindsman has waived any privilege by placing her mental condition at issue in this lawsuit. In response to an Order directing Hindsman to provide answers to questions about the upcoming trial, Hindsman advised that she intends to call her therapists as trial witnesses.

The Undersigned has reviewed all of Hindsman's journal entries, which she submitted under seal. [ECF No. 94].

For the reasons outlined below, Hindsman will be required to produce almost all her journal entries, but there are *some* notes which she may redact. By way of overall summary, she will not be able to redact her journal entries discussing the nature and scope of her issues with alcohol, her views on whether she was raped, her suicide attempts, the prescription medication she has taken or is taking, her therapy and its progress, and her daily mental condition. But a few notes on one page are either irrelevant or of such marginal relevance that the embarrassment factor far outweighs the benefit of production. This Order will pinpoint the page and line numbers of the entries which can be redacted. Plaintiff will need to produce the journal entries in redacted form by October 12, 2020.

I.   **Detailed Factual Background**

   a.   The Rape

On September 13, 2018, Hindsman consumed alcoholic beverages at the ship's karaoke bar. She and her friends then went to a dance club aboard the ship and then went

to the casino. At some point during that day, Hindsman met a crewmember she calls John Doe, a performer in the casino. Carnival later identified the crewmember as Yeison Lizcano, a musician who performed in a band which played on the ship.

The next day, on the morning of September 14, 2018, Hindsman was very ill. She tried to join her friends for breakfast aboard the ship, but she kept running back and forth to the restroom to vomit. She returned to her cabin, where she remained for the remainder of the day.

The following day, September 15, 2018, Hindsman was well enough to go on a shore excursion in Cozumel, Mexico. After returning to the *Valor*, she met a man in the ship's kitchen who asked her, "You don't remember me, do you?" Hindsman did not remember him. During this brief conversation, she learned that they had interacted on the night of September 13, 2018.

That evening while in the dance club, Hindsman was approached by several passengers who she had apparently met on the night of September 13, 2018 -- but she did not remember them either.

John Doe also spoke to her on September 15, 2018. Hindsman recognized him as a performer in the ship's casino but she did not remember interacting with him before he approached her on the 15th. John Doe told Hindsman that they had engaged in sexual intercourse on the night of the 13th. He said, "Don't worry, I wore a condom."

Hindsman protested and questioned John Doe about the events of September 13th.

John Doe told Hindsman that she had shared information about her family and mentioned that she likes salsa dancing. He described her actions on the night of September 13th to be "salsa stumbling."

Hindsman wanted to leave, but John Doe said he wanted to "stay in touch." Hindsman further protested his advances and she returned to her cabin for the remainder of the night. At some point during the night, she woke her cabinmate, Vicki Walker, and told Walker that she believed she had been raped. Hindsman told the other members of her group the same information the next morning.

On September 16, 2020, Hindsman spoke with several other passengers about her incapacitated state on the night of the 13th. One person told her that she had been stumbling and looked to be very intoxicated.

The next morning (i.e., September 17th), the *Valor* returned to port in Texas. Hindsman disembarked and sent a text message to her husband, describing the assault. She also advised Carnival, but this notice did not produce any law enforcement response. Apparently, there was no police or law enforcement investigation, which, not surprisingly, also means that the crewmember was not arrested or prosecuted.

  b. <u>Post-Cruise Trauma and Creation of the Journal Entries</u>

After leaving the ship, Hindsman suffered panic attacks lasting approximately three days. On September 18, 2018, her panic and anxiety at work became so severe that paramedics were called. She left work and followed up with her primary care doctor the

5

next day. She saw a therapist the following week. She was diagnosed with Post Traumatic Stress Disorder.

Hindsman tried to kill herself and she was hospitalized at Bridgeway Hospital, where she received treatment. A Bridgeway Hospital therapist who led the group therapy session in which Hindsman participated asked her to make journal entries.

Hindsman read her journal entries aloud in the Bridgeway group therapy sessions. She also read them to her primary therapist at Thriveworks, an Arkansas facility responsible for her PTSD therapy.

In addition to reading the journal entries aloud during group therapy and the individual therapy sessions, Hindsman also gave her journal entries to her Thriveworks primary therapist.

Hindsman understood her journal entries to be confidential because everything said during group therapy sessions or individual therapy sessions is confidential. She filed under seal 68 pages of journal entries. Some of those pages had only minimal entries (e.g., one or two sentences), while other pages contained more-detailed entries. Some pages contained only one or two words; others contained several paragraphs. All are handwritten.

Hindsman anticipates that the therapists from who she received treatment will be providing testimony at trial. The testimony is expected to be about her group and primary therapy.

## II. Procedural Background

The Court granted without prejudice John Doe's motion to dismiss based on a lack of facts to establish personal jurisdiction over him. [ECF No. 63].

Paragraphs 2 and 3 of the Amended Complaint [ECF No. 35] allege both diversity of citizenship and admiralty jurisdiction. In its Answer [ECF No. 82], Carnival admitted both admiralty and diversity of citizenship jurisdiction. United States District Judge Cecilia M. Altonaga referred all discovery matters to me. [ECF No. 23]. The parties dispute the discoverability of Hindsman's journal entries. Consistent with a Post-Discovery Hearing Administrative Order [ECF No. 92], Hindsman filed under seal [ECF No. 94] her journal entries and both sides submitted a legal memorandum [ECF Nos. 103; 108].

Both Hindsman and John Doe gave deposition testimony. Doe gave a deposition remotely; he was in Colombia, being represented by counsel in Miami, and an interpreter was used (even though Doe can understand a substantial amount of English).

## III. Applicable Legal Principles and Analysis

In her memorandum, Hindsman argues that state law applies. Specifically, she contends that Florida Statute § 90.503 (discussing statutory privilege) governs because "there is no federal rule expressly addressing a psychotherapist-patient privilege" and that state law will apply "if there is no settled admiralty rule on a particular issue." [ECF No. 103, pp. 1-2].

The Undersigned disagrees with Hindsman's legal theory.

> When a federal court decides a maritime case, it acts as a federal "common law court," much as state courts do in state common-law cases. *Exxon Shipping Co.*, 554 U.S. at 507, 128 S. Ct. 2605. Subject to direction from Congress, the federal courts fashion federal maritime law. *See id.*, at 508, n. 21, 128 S. Ct. 2605; *Miles v. Apex Marine Corp.*, 498 U.S. 19, 27, 111 S. Ct. 317, 112 L.Ed.2d 275 (1990); *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409, 95 S. Ct. 1708, 44 L.Ed.2d 251 (1975); *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 42-44, 55 S. Ct. 31, 79 L.Ed. 176 (1934). In formulating federal maritime law, the federal courts may examine, among other sources, judicial opinions, legislation, treatises, and scholarly writings. *See Exxon Co., U. S. A. v. Sofec, Inc.*, 517 U.S. 830, 839, 116 S. Ct. 1813, 135 L.Ed.2d 113 (1996); *East River S. S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 864, 106 S. Ct. 2295, 90 L.Ed.2d 865 (1986).

*Air and Liquid Systems Corp. v. DeVries*, 139 S. Ct. 986, 992 (2019).

This is a maritime tort case. Maritime tort cases are admiralty cases controlled by general federal maritime law. Even when parties allege diversity of citizenship as the basis of the federal court's jurisdiction (as Hindsman did in this case, as an alternate basis for jurisdiction), federal maritime law governs the substantive issues in the case if the injury occurred on navigable waters. *Everett v. Carnival Cruise Lines*, 912 F.2d 1355, 1358 (11th Cir. 1990).

The Supreme Court has found that federal common law[1] protects (1) confidential communications (2) between a licensed psychotherapist, psychologist, or social worker

---

[1] Federal Rule of Evidence 501 provides that "[t]he common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege unless any of the following provides otherwise: the United States Constitution; a federal statute; or rules prescribed by the Supreme Court."

8

and a patient (3) in the course of diagnosis or treatment. *Jaffee v. Redmond*, 518 U.S. 1, 15 (1996). The Supreme Court stated that the patient may "of course waive the protection" of the psychotherapist privilege, but the Court did not delineate the circumstances that constitute waiver. *Id.* at 15 n.14.

Florida district courts agree that federal law, not a state statute on privilege, governs the privilege issues arising under general maritime law. *See Mowbray v. Carnival Corp.*, No. 08-CV-20931, 2009 WL 10667070, at *2 (S.D. Fla. Apr. 13, 2009) (citing Fed. R. Evid. 501). *Mowbray* was a cruise-passenger case in which the plaintiff claimed emotional damages. In deciding waiver and scope of the psychotherapist-patient privilege, the Court applied federal law. *Id.* at *2. The Court rejected plaintiff's argument that Florida state law will supplement, because federal law already defined the scope of the privilege. *See id.* at *3 n.2 ("[T]he psychotherapist-patient privilege has been sufficiently defined by the federal courts. Therefore, the Court does not decide whether Florida law can be applied in this case to 'fill in the gaps,' as there are no gaps to fill.").

Likewise, Florida district courts apply federal law for the same reason in other maritime cases. *See AIG Centennial Ins. Co. v. O'Neill*, No. 09-CV-60551, 2010 WL 4116555, at *8 (S.D. Fla. Oct. 18, 2010) ("Rule 501, Fed. R. Evid., requires the Court to apply the federal common law of privilege because state law does not supply the rule of decision" because the claim arose under Admiralty and Maritime Jurisdiction).

Further, in *Jaffee*, although the privilege applies to communications between a

9

patient and a psychiatric social worker or therapist, the Court did not determine whether the privilege applies in *group* therapy sessions. Carnival argued waiver and did not challenge the existence of a privilege and did not contend that the group status of the communications destroyed the privilege. Therefore, the Undersigned will not address that sub-issue (about the legal distinction, if any, between the existence of the privilege in an individual counseling session and a group session).

In its memorandum, Carnival briefly (in a pithy, three-sentence argument) contends that Hindsman's journal entries are not protected by the privilege because Hindsman's journal is "not a communication to her therapist." [ECF No. 108, p. 4]. The Undersigned is not convinced. Although the notes were made in Hindsman's journal, they were made at the direction of her therapist, were read aloud to her therapist during group therapy sessions, and a copy was given to the therapist. The entries are, in fact, "communications made during counseling sessions." *Jaffee*, 518 U.S. at 10.

The Eleventh Circuit has not addressed waiver of the psychotherapist privilege, district courts "routinely hold that a party waives the psychotherapist privilege by alleging that he suffers from a mental impairment, or by bringing a claim that requires proof of a mental impairment." *Jacobson v. City of West Palm Beach*, No. 16-cv-81638, 2017 WL 11549934, at *1 (S.D. Fla. Jan. 12, 2017).

Nevertheless, many other district courts in our Circuit have adopted a middle position and hold that a plaintiff does not put his or her mental health at issue "by simply

10

alleging mental anguish" or a "garden variety" emotional distress. *Chase v. Nova Se. Univ., Inc.*, No. 11-61290-Civ, 2012 WL 1936082, at *4 (S.D. Fla. May 29, 2012); *see also Ortiz–Carballo v. Ellspermann*, No. 5:08–cv–165–Oc–10GRJ, 2009 WL 961131, at *2 (M.D. Fla. Apr. 7, 2009) ("The majority of federal courts that have addressed the issue have held that a party does not place his mental condition in controversy merely by requesting damages for mental anguish or 'garden variety' emotional distress."); *Stevenson v. Stanley Bostitch, Inc.*, 201 F.R.D. 551, 553 (N.D. Ga. 2001) (same).

Judge Altonaga, who presides over the instant case, has already (in *Mowbray*) adopted the middle-of-the-road approach. *See Mowbray*, 2009 WL 10667070, at *2.

As explained in *N.D. ex rel. Dorman v. Golden*, the courts have identified five conditions in which a plaintiff's mental health is placed "in controversy":

> (1) stating a tort claim for intentional or negligent infliction of emotional distress;
> (2) alleging a specific mental or psychiatric injury or disorder;
> (3) alleging unusually severe emotional distress;
> (4) intending to offer expert testimony to support a claim for emotional distress damages; and/or
> (5) conceding that his or her mental condition is in controversy.

No. 2:13-cv-540, 2014 WL 1764714, at *5 (M.D. Fla. May 1, 2014).

However, it is unnecessary for the Undersigned to grapple with whether the above conditions should provide a standard for this Court to follow because it is abundantly clear that Hindsman *has* placed her mental health at issue in this case. She has alleged PTSD as a result of the alleged rape. Moreover, it is her mental anguish and emotional

11

damages which are at the heart of this case. She has not alleged these mental damages as a collateral consequence to a physical injury, such as a plaintiff who generally alleges mental anguish as a consequence of a physical injury, such as losing a limb or requiring orthopedic surgery. For all practical purposes, the damages portion of this case is focused on emotional and mental consequences.

Under these circumstances, Hindsman's claim is far from a "garden variety" claim. *McBride v. Houston Cnty. Health Care Auth.*, No. 1:12-cv-1047, 2014 WL 707166, at *3 (M.D. Ala. Feb. 24, 2014) (finding plaintiff "clearly put her mental health at issue by contending that she has suffered psychological injuries, mental anguish, and post-traumatic stress disorder"); *Thomas v. Seminole Elec. Coop. Inc.*, No. 8:16-cv-3404, 2017 WL 2447722, at *4 (M.D. Fla. June 6, 2017) (finding plaintiff placed her mental condition at issue by alleging she suffered depression because of defendant's conduct).

However, the mere fact that Hindsman has placed her mental health in controversy and consequently waived the privilege, does not necessarily mean that she is required to disclose all of her confidential journal entries. The entries still must be encompassed by the scope of discovery in Federal Rule of Civil Procedure 26(b). That means the discovery must be "relevant" to a claim or defense and meet the "proportionality" requirement of subsection (b).

Moreover, Hindsman may be entitled to a protective order under subsection (c), which authorizes a court to protect a party or person from "annoyance, **embarrassment**,

12

oppression, or undue burden or expense." Fed R. Civ. P. 26(c)(1) (emphasis added); *see, e.g.*, *Barnello v. Bayview Loan Servicing, LLC*, No.14-CV-1383, 2016 WL 11565523, at *4 (M.D. Fla. Mar. 11, 2016) (finding waiver of privilege but granting motion for protective order and ruling that defendant may not obtain discovery of records from licensed clinical social worker because they were disproportional to the needs of the case).

The Undersigned has reviewed all 68 pages of handwritten journal entries and, based on a proportionality analysis,[2] requires Hindsman to produce all of her journal entries other than the following, which may be redacted: Page 39 (lines 4 through 8, starting with "Candace" and ending with "it").[3]

---

[2] Hindsman alleges that she "suffers and *continues* to suffer from emotional distress and debilitating mental health issues." [ECF No. 35, p. 6 (emphasis added)]. Therefore, her mental state on a daily basis is relevant. Thus, a seemingly innocuous entry, e.g., (hypothetically), "I feel good about myself today" -- is relevant because it shows she did not feel the need to write anything about depression or anxiety. On the other hand, an entry about a disagreement with her husband might be relevant because it could show reasons for depression or anxiety other than the alleged rape. In addition, a journal entry about another reason for stress, e.g., (hypothetically), "I am upset over my weight and the comments about it by my family" -- is discoverable on the issue of causation, at a minimum. Finally, it is difficult to predict with certainty now what an expert witness might deem relevant from the journal entries.

[3] This ruling relates only to discovery. It does not determine whether all, some, or none of the journal entries are admissible at trial or could be fairly used by experts as a basis for their opinions. Judge Altonaga is the judge who will have the final say-so over trial admissibility issues (and over decisions about the use of the journal entries for other purposes, such as in summary judgment motions or responses).

## IV. Conclusion

Hindsman has waived the psychotherapist-privilege over her journal entries by placing her mental health at issue in more than a "garden variety" way. With the one exception for the redaction, she must produce the journal entries by **October 12, 2020**.

**DONE AND ORDERED** in Chambers, in Miami, Florida, on October 5, 2020.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Cecilia M. Altonaga
All counsel of record